Filed 10/27/23  P. v. Jimenez CA6
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>RAMIRO JIMENEZ,<br><br>　　Defendant and Appellant. | H048103<br>(Santa Clara County<br>Super. Ct. No. C1653253) |

After defendant Ramiro Jimenez represented himself at trial, a jury found him guilty on three counts of sexual acts with a minor under the age of 16.  The trial court imposed an aggregate term of three years in state prison.

Among other claims, Jimenez contends he did not enter a valid waiver of his right to counsel before the trial court granted his motion to represent himself under *Faretta*.[1]

For the reasons below, we conclude this claim is meritorious, requiring automatic reversal.  Accordingly, we will reverse the judgment.  We do not reach the remaining claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural Background*

The prosecution charged Jimenez with three counts: count 1—unlawful sexual intercourse with a minor under 16 years of age (Pen. Code, § 261.5, subd. (d))[2];

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2] Subsequent undesignated statutory references are to the Penal Code.

count 2—sodomy with a person under 16 years of age (§ 286, subd. (b)(2)); and count 3—oral copulation with a person under 16 years of age (former § 288a, subd. (b)(2)). A jury found Jimenez guilty on all counts. The trial court denied probation and imposed a term of three years in prison on count 1. The court imposed two-year terms for each of counts 2 and 3 concurrent with the term on count 1.

## B. Facts of the Offenses

The prosecution alleged Jimenez engaged in multiple sexual acts with a 15-year-old girl, including intercourse, oral copulation, and sodomy, in 2013. Jimenez was 32 to 33 years old at the time.

### 1. Mother's Testimony

Cecilia Doe, the girl's mother, testified that she was working as a prostitute when she met Jimenez for a paid date, whereupon they developed an ongoing friendship. Cecilia and Jimenez got together around three or four times a week. A few months after they met, Cecilia introduced Jimenez to her daughter, C.D., who had just turned 15. Sometimes Cecilia and C.D. would sleep at Jimenez's house, where all three shared a bed with Cecilia in the middle to separate him from C.D.

In October 2013, Cecilia and C.D. were arrested for shoplifting and Cecilia was booked into jail. Cecilia told the police to contact Jimenez to pick up C.D. while Cecilia remained in jail for about two weeks. Cecilia permitted C.D. to go to Jimenez's home during that time but did not intend for C.D. to spend the night there. Just before Cecilia was released, she learned C.D. was spending some nights at Jimenez's home.

After Cecilia got out of jail in early December 2013, she saw text messages on C.D.'s phone in which C.D. referred to having sex with "R.J." in texts she had sent to a friend. Cecilia believed "R.J." was Jimenez. The prosecution introduced the text messages into evidence.

Cecilia testified that she confronted Jimenez with the text messages but he denied they were true and asserted instead that C.D. was seeking attention. Cecilia only saw

2

Jimenez on one more occasion while picking up a T.V. she had left with him. Cecilia wrote a letter to Jimenez telling him to stay away from C.D., and that if he did not, Cecilia would contact his wife and the district attorney. Cecilia did not confront C.D. about the text messages right away, but about two months later, Cecilia asked her about them, and C.D. admitted to having sex with Jimenez. Cecilia then contacted the police.

### 2. Victim's Testimony

C.D. was 21 years old when she testified at trial. C.D. testified that she sometimes went to Jimenez's home while her mother was in jail in 2013. One night C.D. fell asleep in Jimenez's bed, and she woke up to find him in bed with her. C.D. then felt Jimenez's hands on her body, and he put his hand on her head to move it further down his body. C.D. then performed oral sex on Jimenez, and they had vaginal intercourse. She did not verbally agree to engage in sex with him, but at the time she felt it was consensual. She was 15 years old when this occurred.

C.D. testified that she and Jimenez engaged in sex on more than five occasions while her mother was in jail. They engaged in vaginal intercourse, she performed oral sex on him, and on one occasion he put his penis into her anus.

### 3. Pretext Phone Call

In March 2014, after Cecilia had contacted the police, C.D. agreed to make a pretext phone call to Jimenez. The prosecution played a recording of the call for the jury. At the start of the call, C.D. told Jimenez her mother had been acting "really funky lately." C.D. then asked Jimenez if he had told Cecilia that he and C.D. had sex. Jimenez responded, "No. I did not tell her anything." C.D. said she felt like Cecilia found out about the sex, and C.D. asked Jimenez if he knew how Cecilia found out about it. Jimenez responded, "I didn't tell her anything about anything. I said nothing to nobody about nothing. Quite honestly, the way that she came at me with stuff, I mean, I don't want anything to do with it, you know?" Jimenez said that Cecilia had shown him the text messages. Jimenez again said, "I don't want to have anything to do with it."

3

C.D. continued to ask Jimenez about his communications with Cecilia, and he repeatedly asserted he had not said anything to anybody. Jimenez then said that when Cecilia confronted him with the text messages, he told her he hadn't done anything with C.D. He subsequently stated, "I'm not admitting anything because quite honestly, it's all bullshit right now."

### 4. Jimenez's Testimony

In his defense, Jimenez testified in narrative fashion. He categorically denied C.D.'s allegations, stating, "[T]here is absolutely no way that any of the accounts that were described by [C.D.] could possibly be true." Jimenez testified that he was suffering from kidney stones throughout the majority of 2013, and he was taking medication that eliminated his sex drive. Jimenez introduced his medical records into evidence. As to the pretext phone call, Jimenez testified that, in the statements he made during the call, he was simply denying that anything had actually happened. He explained he stated in the call, "I didn't tell [Cecilia] nothing," because "[t]o me there was nothing to tell."

## II. DISCUSSION

Jimenez contends we must reverse the judgment because he did not enter a valid *Faretta* waiver of his right to counsel. The Attorney General argues the record shows Jimenez knowingly and intelligently waived his right to counsel, such that the trial court properly allowed him to represent himself. The Attorney General further argues that even if the waiver was invalid, the error was harmless.

### A. Procedural Background[3]

The prosecution first filed charges against Jimenez in 2014, but the victim refused to testify and the prosecution dismissed the matter. The victim later recontacted the

---

[3] Because we are required to "independently examine the entire record" to determine whether a defendant knowingly and intelligently waiver the right to counsel, we include a detailed description of the events that led to Jimenez entering a *Faretta* waiver. (*People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener*).)

4

prosecution after changing her mind, and the prosecution refiled the complaint in December 2016. Jimenez retained private counsel, and a preliminary hearing was held in February 2018. Jimenez was held to answer on the charges and the prosecution filed an information in March 2018.

Around May 2018, Jimenez retained another attorney, Holden Green, to replace his prior attorney. Green filed two separate motions to dismiss but both were denied, and in April 2019, the court set a trial date of July 8, 2019.

In June 2019, Green filed a motion to continue the trial on the grounds that he was scheduled to undergo throat surgery on August 1, 2019 and the scheduled July trial date would interfere with his pre-operative appointments. He further asserted he needed time to arrange for several defense witnesses to travel from out of state, and he claimed he had court appearances in other matters scheduled during the week of the trial date set for this case. The prosecution opposed the motion on the ground that Green had not shown good cause. The prosecution argued the trial would be over before Green's scheduled surgery date and pointed out that Green had scheduled the other July court appearances back in May, *after* the trial date for this case had already been set. At a hearing on the matter, the trial court found no good cause for a continuance and denied the motion.

The parties appeared before a different judge on the July 8, 2019 trial date, and Green again moved for a continuance. The court noted that it had reviewed Green's previously denied motion and asked if counsel could set forth any new grounds for the instant motion. First, Green claimed he had just learned of another out-of-state witness, and although he had not yet talked to the witness, counsel needed time to arrange for transportation. Second, Green asserted he had just provided new discovery to the prosecutor—specifically, a transcript of the March 2014 pretext phone call between Jimenez and the victim. Third, Green claimed he needed time to subpoena a witness who had testified at the preliminary hearing in February 2018. Green also stated that, while he did not want to discuss his health issues on the record, he would be required to take a

5

drug the week before his surgery, and one side-effect would be "a severe cotton-mouth-type activity" making it hard to speak. He further asserted he was "on call at Stanford" with a headache issue, and the hospital might call him at any time with an immediate appointment. As to the other scheduled court appearances, Green claimed he was unable to schedule them for other times.

The prosecutor objected on the grounds that the case was old; defense counsel knew or should have known about the witnesses long ago; and Jimenez presented a danger to public safety because he was out of custody while trial was pending. The prosecutor said she already had her own transcript of the pretext phone call, and she pointed out that the police reports from 2014 also included a transcription. Green responded with a series of claims about the relevance of the evidence and witnesses he proposed to investigate.

The trial court rejected Green's claims about the relevance of his proffered witnesses and added, "[A]s far as I can tell, everything I've heard, you have absolutely no basis for a delay in this trial." But the court agreed to discuss Green's health issues with counsel off the record before ruling on the motion. After meeting in chambers, the court memorialized the discussion on the record and stated that it accepted Green's representations about his preoperative appointments scheduled the week before surgery. The court said it asked Green to provide information from his doctor concerning Green's anticipated health status after the surgery and how much time he would need to recover, but Green refused to provide any such information. Green informed the court that his pre-operative appointment was on July 29, and the court offered to set a schedule that would conclude the trial before that date, but Green asserted that he was also suffering from neurological "headache issues" that were affecting his "cognitive strength" and ability to focus. Green stated Jimenez "deserves an attorney that is a hundred percent well and a hundred percent prepared and a hundred percent ready to go so there are no distractions for that period of time."

6

The trial court ordered Green to provide documentation from his doctor providing the dates of the pre-operative appointment and surgery, as well as the doctor's opinion on when Green would be medically able to proceed. The court ordered the parties to return on July 17, 2019, and ordered Green to provide the doctor's information by that date. The court stated it would rule on the motion to continue and set a new trial schedule on that date.

The prosecutor responded that she was concerned about the additional delay, adding that in the chambers discussion, "I heard multiple times today that Mr. Jimenez would like to fire Mr. Green. And what I'm concerned about is that we're going to be coming back again, and that he's going to attempt to delay this trial even longer." The court asked Jimenez to comment on whether he might fire Green, and Jimenez responded, "Your Honor, I just want my attorney to be one hundred percent healthy to represent me so I have the best chance at a defense possible." The court reiterated that it expected Green to provide documentation from his doctor on July 17 and stated, "If he doesn't, I will continue to continue the case until he provides that information." As to whether Jimenez wished to fire Green, Jimenez personally affirmed that he believed Green was competent and he wanted Green to continue representing him provided the court granted a continuance and Green was healthy to proceed.

Green filed motions in limine that same day. Portions of the filing referenced the facts of some other case apparently involving a residential burglary or trespass offense. Other portions appeared to have been cut from a prior motion filed in another case and pasted into this filing—literally as pieces of paper cut and pasted or taped onto the filing—resulting in syntactic discontinuities, nonsensical arguments, and references to nonexistent pleadings. One portion of the filing included multiple "motions" asserting in various ways that "**THE DEFENSE MUST BE ALLOWED TO ASK ON CROSS EXAMINATION ANY WITNESS WHO MAY HAVE KNOWLEDGE OF OTHER SEXUAL PARTNERS OVER THE AGE OF EIGHTEEN WHO HAD SEXUAL**

7

**ACTIVITY WITH VICTIM . . .**"  These motions were presented in the form of several headings that restated the motion with minor variations, each typed entirely in a bold, all-capitalized font, with no supporting argument for any of them.  One of the headings asserted the defense should be allowed to question the victim about these matters under Evidence Code section 782 (setting forth procedures for establishing exceptions to the inadmissibility of such evidence under the "Rape Shield Law").  But the filing failed to include any of the foundational requirements for establishing such exceptions—e.g., an affidavit filed under seal stating an offer of proof of the relevance of such evidence. (Evid. Code, § 782, subd. (a).)[4]

At the hearing on July 17, 2019, Green presented the court and the prosecutor with a copy of a motion to disqualify the judge.  Green claimed his papers included a note from his doctor stating he would be unavailable until August 30.  Green stated he wished to file the motion under seal, but the court informed him he had not properly prepared it for filing under seal.  Green then stated he wished to file the motion publicly without the doctor's note, and Green offered a copy of the note for the court to review.[5]  Over Green's objection, the court set a trial date of August 26, 2019, and the court set a hearing date of July 26 for the motion to disqualify.  The prosecution then presented the victim, who gave a statement on the record expressing her frustration with the repeated delays.

On July 24, 2019, the trial court filed a written order striking the motion to disqualify on the ground that Green's motion failed to set forth any legal basis for disqualification.

At a hearing on July 26, 2019, the court explained why it ruled on the motion to disqualify before the hearing had occurred, and the court maintained the August 26 trial

---

[4] This court finds those portions of Green's filing particularly disturbing.  Absent any offer of proof, we can discern only one reason for making such claims: to intimidate the victim or otherwise dissuade her from testifying.

[5] The record includes a filed copy of the motion to disqualify and two accompanying declarations by Green, but the filings do not include the doctor's note.

date. Green again objected to the trial date, asserting that his doctor had informed him he would not be available until August 30.

Jimenez then personally addressed the court and stated that if Green was not going to be healthy and physically prepared to proceed at the start of trial, "[T]hen I have no choice but to replace Mr. Green and would like to be sent to the public defender's office, if possible." The court stated that the only doctor's information it had received from Green consisted of a one-page form "with a check mark and signature and some items on it" that Green "allowed me to look at" before asking the court to give the document back to him. The court added that the document had set forth a date of August 30, which was a Friday, so the court set the trial date for August 26, the preceding Monday.

The court then instructed Jimenez, "I can guarantee you, without reservation, if your lawyer isn't able to go forward with the trial, the case will be continued again." The court stated it had balanced Jimenez's right to a fair trial with the victim's interests in a timely trial. The court further instructed Jimenez, "If the only reason you want to excuse Mr. Green as your attorney because you're not clear whether or not he'll be medically able to proceed, I'm telling you that will not occur." The court reiterated that if Green was not medically able to proceed, the court would grant another continuance. Jimenez asked what would happen if Green simply did not appear, and the court informed Jimenez there would no penalty and he would not go to trial at that point.

After conferring privately with Green, Jimenez then informed the court, "I'd like to go ahead and move forward with your public defender." Jimenez confirmed that he had privately retained Green and now wished to relieve him. The court stated, "You have an absolute right to do so. Mr. Green will be relieved as your attorney of record." The court referred Jimenez to the public defender and set a hearing on July 31, 2019 for identification of counsel. The court ordered Green to appear at the hearing and transfer the discovery to the public defender.

9

At the hearing on July 31, 2019, the parties appeared before a different judge—the Honorable Vanessa Zecher. Green appeared with Jimenez and informed Judge Zecher that Jimenez had gone to the public defender's office, who determined Jimenez did not qualify. Green stated he would be on medical leave until August 30 and requested a hearing after that date. When the court asked why Jimenez had been referred to the public defender's office, Green stated he was being relieved. The prosecutor added, "Your Honor, I understand that the client wanted to fire Mr. Green." The court asked Jimenez to confirm this, and Jimenez did so, whereupon the court ordered Green relieved.

The court asked Jimenez if he needed more time to seek a new attorney, and Jimenez requested a month to do so. The court ordered him to return on August 14, 2019 for trial setting, and Jimenez responded, "[I]f I'm going to need to put together a retainer," he would prefer to apply the cost of repeated travel from his home in Texas—$600 or $700 each week—toward attorney fees. The court declined to change the August 14 date. Green offered to remain in the case until Jimenez found a new attorney, but the court informed Green he had already been relieved.

Jimenez appeared without counsel at the August 14 hearing with Judge Zecher presiding. A deputy public defender informed the court Jimenez had been interviewed by the office on July 26 but he did not qualify for indigent representation. The court asked Jimenez if he needed more time to find counsel, and he said he did. The court set the next hearing date for August 28, 2019.

The prosecution filed a "Victim's Request for Trial Setting" on August 27, 2019 with a written statement by the victim stating her frustration with the repeated delays. The prosecution's filing set forth the procedural history of the matter and argued the defense was intentionally delaying trial in the hopes the victim would give up and refuse to cooperate with the prosecution.

At the hearing on August 28, 2019, Jimenez again appeared without counsel before Judge Zecher and stated he was still in the process of finding an attorney. He

10

asserted he had contacted the "Modest Means" program and did not qualify for it. Jimenez informed the court he had scheduled attorney consultations for the next day, and added, "After that my only impediment will be the retainer and getting a quote for what the amount will be for trial representation." He requested another two weeks to find an attorney. The court set another hearing for September 11 and informed Jimenez the court would set a trial date at that time.

On September 11, 2019, Jimenez appeared without counsel before Judge Zecher and informed her he had not succeeded in finding an attorney. Jimenez then stated, "I'd like to move forward to represent myself in this matter," and he provided the court with a completed *Faretta* waiver form.

The seven-page, court-supplied waiver form is titled, "PETITION TO PROCEED IN PROPRIA PERSONA (TO ACT AS MY OWN ATTORNEY)". A section titled "LEGAL RIGHTS" describes six constitutional trial rights, each prefaced by "I understand that I have the right to . . . ." The right to appointed counsel is printed in bold as follows: "I understand that I have the right to be represented by a lawyer at all stages of the proceedings and, if I do not have funds to employ counsel, one will be appointed for me by the Court." Two paragraphs at the bottom of the page require the signee to affirm that they personally desire to give up the right to appointed counsel and understand they will be required to conduct their defense without counsel. Jimenez's signature appears below this section.

In a section of the form for biographical information, Jimenez listed his age as 38, and he stated he had graduated from high school and "National Mine Safety & Health Academy." His employment experience consisted of 16 years in the mining industry, most recently as an "Area Safety Manager." Two sections for listing any prior criminal or civil matters involving self-representation were left blank.

In two pages of the form, Jimenez initialed eleven separate paragraphs setting forth the disadvantages of self-representation, including the fact that he would be

11

required to follow various technical rules, conduct pretrial motions, examine witnesses, make arguments, opening and closing statements, and so forth. He initialed an advisement stating, "I understand that if I change my mind and decide I need an attorney, depending on the stage of the proceedings, my request for an attorney may be denied."

In a section of the form for listing the charges, Jimenez listed them as "261.5d", "288a", and 286c". In a section for listing the possible penalties for a conviction, he entered a minimum term of 16 months in state prison and a maximum term of 3 years. This section of the form lists other potential penalties—county jail, state prison for life with and without parole, and the death penalty—and the form instructs the defendant to cross out those penalties that do not apply. None of the inapplicable penalties were crossed out. The form supplies three blank lines for the defendant to respond to the following prompt: "I am aware that there are certain legal defenses to the crime(s) with which I am charged, and they are as follows:" This section was left blank.

In a section of the form titled "COURT'S ADVICE AND RECOMMENDATION", Jimenez initialed the statement, "I understand that it is the advice and recommendation of this court that I do not represent myself, and accept counsel appointed by the Court." His signature appears below. The judge's signature appears below a paragraph stating, "The Court has made inquiry into the defendant's educational background, training and knowledge, and based on that inquiry and the advisement to the defendant of all of the above initialed statements, finds that the defendant knowingly and intelligently gives up his/her right to counsel and may represent himself/herself in all proceedings in this case."

Upon receiving the form from Jimenez, Judge Zecher looked at the form and asked him if the initials and signatures on it were his. Jimenez affirmed they were. The court noted that Jimenez had "some formal education" and advised him as follows: "I am required to tell you that—as you have indicated in the form, it's not a good idea to represent yourself, given the level of experience that is present with the District

12

Attorney's Office. But I also tell you that you have the constitutional right to represent yourself." The court asked Jimenez if he understood that. Jimenez responded that he did and he confirmed he still wished to proceed.

Judge Zecher then asked Jimenez if the court had referred him to the public defender's office, and Jimenez confirmed he had been referred and said he did not qualify for indigent representation or the "Modest Means" program. The court suggested that he contact the county bar association for an attorney referral, and the court proposed giving him a week to do so. Jimenez responded, "At this point, Your Honor, I just want the best defense possible. I've had multiple attorneys on the matter. And from my vantage point the prosecution has failed to provide any type of compelling evidence that proves beyond a reasonable doubt the crimes that were committed. [¶] So I'm more than comfortable moving forward."

The court then granted the *Faretta* motion. Immediately after granting the motion, the court told Jimenez, "If at any time you decide to change your mind pretrial, please let me know. And then once trial comes along we'll talk. It's a little different at that point in terms of a request to no longer proceed as a self-represented litigant." Jimenez responded that he understood this advisement.

The court then raised the matter of trial scheduling. The prosecutor requested a trial date. She pointed out that the case was old, and asserted her belief that Jimenez had been switching attorneys to delay the proceedings. The trial court stated it would set the trial date "a little bit further out" to give Jimenez time to prepare and advised him, "Know that if you come in in three months and you say, now I want an attorney, that may not happen. You are now representing yourself." Jimenez responded that he understood. The court then orally set a status hearing for October 16, 2019 and a trial date of November 18. Both parties agreed to this schedule.

13

Jimenez failed to appear at the status hearing on October 16. The court issued a bench warrant and vacated the November 18 trial date.[6] On November 15, 2019, attorney Holden Green filed a request for calendar setting on behalf of Jimenez. The request stated Jimenez had missed the status hearing "due to inadvertent neglect and would like to produce a letter of reassumption and select a trial date."

The next hearing occurred on November 18, 2019 before Judge Zecher. Jimenez appeared and told Judge Zecher he had missed the status hearing because the written notice he had been provided on September 11 listed November 18 as the "next appearance."[7] The court recalled the bench warrant and inquired about scheduling the trial. The prosecutor requested that the case be put on the master trial calendar for December 2. Jimenez then stated that he had been in contact with Holden Green, and that Green was willing to represent him again if the court would set a hearing for identification of counsel and trial setting on December 4. The prosecutor responded that "the People have concerns about Mr. Green handling this case," and argued that Jimenez was once again engaging in tactics intended to delay the trial. Judge Zecher stated, "[S]o the Court is familiar with the situation with Mr. Green. [¶] The fact that you did fire Mr. Green, and now I'm hearing that he's back in the mix. So I'm going to set a December 2nd trial date. You may file a written motion to continue, and let me know the reasons why and what has been done to date to prepare this case for trial. But a year and a half is a long time. It is also unusual to fire your attorney while you're in trial." The court instructed the parties to address any further issues in writing.

The parties appeared before a different judge—the Honorable Matthew Harris— on the December 2, 2019 trial date. Jimenez moved to withdraw his *Faretta* waiver and

---

[6] As described below, the prosecutor subsequently informed a different judge that she had asked the court to maintain the November 18 trial date.

[7] The minute order for the September 11 hearing shows November 18, 2019 handwritten on a line labeled "NEXT APPEARANCE". The October 16 date is handwritten in a space above that line.

14

requested that Holden Green be allowed to represent him. Jimenez asserted that Green "had been removed from the case due to medical reasons, which would have prevented him from being able to represent me in trial previously." The prosecutor responded that a continuance had been granted for Green to undergo his surgery and the case was set to go to trial, at which point Jimenez fired him. The prosecution argued Jimenez was engaged in delay tactics by changing attorneys, firing Green, representing himself, and now seeking to have Green represent him again.

Jimenez responded that he was not ready to go to trial, that Green had just given him a transcript of the preliminary hearing, and that preparing for trial was "too much for me to handle." Jimenez added, "I have an understanding of facts and findings and what the true facts of the matter are in this case, Your Honor, but the legalese, the motions, the legal jargon, that's far [a]field from my level of knowledge at this point."

When the court asked Jimenez why he had decided to represent himself, Jimenez explained that the court had ordered Green to return before Green's recovery period was complete, and Jimenez did not want to be disadvantaged by an attorney who could not use his voice. Jimenez stated that Green recontacted him around the middle of October and informed Jimenez he was "medically cleared to go." The court asked Jimenez if he had filed a motion to continue. Jimenez asserted that he attempted to have Green file a motion to continue but "it was blocked off" and Green could not file it. Jimenez stated he now had a written motion for continuance ready to file, whereupon the court received it, reviewed it, and filed it. The motion includes a declaration by Jimenez stating he needed more time to prepare and arrange for an out-of-state witness to testify at trial; that he had a new discovery request; and that Green had not been willing to send Jimenez "sensitive material" by mail or e-mail. Jimenez requested that Green be allowed to resume representation; that the court vacate the December 2 trial date; and that the court set December 23, 2019 as a date for Green to appear. The prosecutor responded that all

discovery was provided personally to Jimenez after he moved to represent himself, and she again argued that Jimenez was engaged in delay tactics.

Green, who was present at the hearing, attempted to address the court, but the court twice instructed him, "Sit down and be quiet." After reviewing the file, the court asked Green if he was prepared to go to trial, and if not, by what date would he be prepared. Green stated he was not prepared and he would be unable to go to trial until February 17, 2020.

Judge Harris stated, "I understand from Judge Zecher that this matter had already proceeded to trial." The prosecutor responded, "Yes, Your Honor." The court continued, "And that according to Judge Zecher, the defendant had fired Mr. Green during trial. I'm trying to decide if a record exists such that I should exercise my discretion to make the defendant go forward or not." Judge Harris then asked the prosecutor for further clarification on what had happened when the case was set for trial. The prosecutor summarized the relevant history of the proceedings and stated that by the November 18 date, "[s]uddenly Mr. Green is back in the picture." The prosecutor informed the court she had been in another trial on the November 18 date, such that Jimenez's case had trailed it until the trial was completed at the end of November.

Jimenez then offered his own summary of the case history and asserted again that he relieved Green because he felt he could not go to trial with an incapacitated attorney, at which point he was given time to find new counsel. Jimenez stated that the cost of repeated travel from Texas was "kicking my tail in the dirt," and he asserted, "I could not put together the retainer for an attorney at that point in time. I felt I had no other choice but to represent myself at that point in time. Otherwise, I was going to be coming every two weeks with nothing to show to the Court at that point in time." Jimenez pointed out that he attempted to withdraw his *Faretta* waiver at the November 18 hearing but the court denied it. Jimenez also stated that he could not afford the trial retainer for the attorney who had represented him at the preliminary hearing.

16

After a recess, the trial court returned and questioned Jimenez about why he had waited so long to bring Green back into the case. Jimenez stated Green had been "out of commission" for six to eight weeks, after which Green was "out of the country for a while." Jimenez said he was not aware Green was available until Green contacted him at the end of October.

Judge Harris stated, "Judge Zecher represented to me, a few minutes ago," that she had *not* told Jimenez at the November 18 hearing that he had to represent himself. Judge Harris stated Judge Zecher recalled saying something to the effect that, " 'If you want Mr. Green, he needs to be ready to go on the trial date.' " When the court asked Jimenez if he recalled Judge Zecher making this statement at the November 18 hearing, Jimenez responded, "Not at all, Your Honor. Not at all." Jimenez again denied Judge Zecher made such a statement, and he denied he was attempting to delay the proceedings.

The prosecutor stated Green had contacted her (the prosecutor) on November 11 to inform her he was willing to resume representing Jimenez. She said she and Green discussed the bench warrant that was outstanding at the time, and because it appeared Jimenez had not intentionally missed the October 16 status hearing, the prosecutor did not object to having the warrant recalled. The prosecutor told the court, "I actually facilitated it so that we could keep the trial date on November 18th," and she asserted that she told Green they would be ready to go forward on November 18 "or soon thereafter" once her trial in the other matter was complete. The court asked the prosecutor whether November 18 was a trial date or a trial setting date, and the prosecutor asserted it was a trial date.

After summarizing his understanding of the procedural history, Judge Harris denied Jimenez's motion to withdraw the *Faretta* waiver and maintained the trial date. The court found multiple factors supporting its ruling: that Jimenez had been given sufficient time to find an attorney; that Jimenez had knowingly waived his right to counsel; that he had sufficient time to prepare for trial; that Green had been given

17

sufficient time to reappear; that the trial would be neither long nor complex; that Jimenez appeared to be "very articulate and logical," "[s]eems quite capable of representing himself," and "seems to have a firm grasp of the facts and procedures"; that the request to withdraw the *Faretta* waiver was "most likely a delay tactic" without good cause; and that further delay would be unfair to the victim.

While Judge Harris was issuing the ruling, Green attempted to interject and inform the court he could be available in December, but the court refused to recognize him. Jimenez objected to the ruling and argued that at the time of his *Faretta* waiver, "Judge Zecher explained to me that I had up to until the day before trial to inform the Court that I had found an attorney; that I could do so as long as before trial." Jimenez then accused the prosecutor of keeping the trial date set to prevent him from retaining counsel, and he asserted the record showed this. The hearing transcript indicates that the prosecutor laughed and responded, "It is not on the record."

Judge Harris ordered the parties to return the next day, December 3, 2019, for a hearing on in limine motions and jury selection. The prosecution filed its trial brief, witness list, and motions in limine on that date, and Jimenez filed a motion to disqualify Judge Harris. At the hearing, Jimenez reiterated his desire to retain counsel. The court ordered the parties to return on December 12 for a ruling on the motion to disqualify and advised them they could anticipate starting trial on December 16. Judge Harris informed Jimenez he could use the time to prepare for trial and retain an attorney, but that he would be required to represent himself if he did not have an attorney ready to proceed to trial.

Jimenez appeared without counsel at the December 12, 2019 hearing. Jimenez informed the court he had talked to an attorney, but the attorney was not available until February 2020. The trial court denied and struck the motion to disqualify. The prosecutor stated she had informed Jimenez she would be unavailable from December 23 to January 5 for a vacation. She estimated the trial would require one and one-half weeks. Judge Harris expressed disappointment that Jimenez had not yet retained counsel,

18

and Jimenez responded, "It's a question of retainer and finances, Your Honor." The court told Jimenez, "[I]f it's a money issue and you spent your money with Mr. Green, that's between you and him." The court admonished Jimenez, "[U]nless you have an attorney when we have the wheels of the trial begin, you're on your own and you're going to represent yourself. We're not waiting." The court ordered the parties to return on December 19 for motions in limine and set January 6, 2020 to begin jury selection. The court instructed Jimenez that if he wished to be represented by counsel, he would have to appear with an attorney ready to proceed at the motions hearing. Jimenez stated he was in the process of raising money by selling his car and a "few high-dollar items I have in my home, so I can secure counsel."

At the motions hearing on December 19, 2019, Jimenez appeared without counsel but told the court that attorney Holden Green would be present and ready for trial on January 6. Judge Harris stated that Jimenez was required to have an attorney who was ready for this motions hearing, and he ordered Jimenez to represent himself. The court then heard argument on motions in limine.

On January 6, 2020, the court began jury selection and heard further argument on motions in limine. The parties made opening statements and the prosecution began presenting evidence the next day. Jimenez continued to represent himself throughout the proceedings.

## B. Legal Principles

Criminal defendants have a constitutional right to proceed without counsel when they voluntarily and intelligently elect to do so. (*Faretta*, *supra*, 422 U.S. at p. 807.) The right to counsel can be waived only if such waiver is knowing, intelligent, and voluntary. (*People v. Woodruff* (2018) 5 Cal.5th 697, 731.)

"[B]efore a defendant may be allowed to proceed *pro se*, he [or she] must be warned specifically of the hazards ahead." (*Iowa v. Tovar* (2004) 541 U.S. 77, 88-89 (*Iowa*).) " 'A defendant seeking to represent himself "should be made aware of the

dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." [Citation.] "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]" (*Burgener*, *supra*, 46 Cal.4th at p. 241.)

"The information a defendant must possess in order to make an intelligent election, . . ., will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." (*Iowa, supra*, 541 U.S. at p. 88.) "[R]ecognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him [or her] to waive his right to counsel at trial." (*Patterson v. Illinois* (1988) 487 U.S. 285, 298 (*Patterson*).) A "more searching or formal inquiry" is required before permitting an accused to waive the right to counsel at trial than is required for less substantial stages of a criminal proceeding—e.g., postindictment questioning. (*Id.* at pp. 299-300.)

Although no single specific advisement by the trial court is required, the California Supreme Court has identified a set of "suggested advisements and inquiries" previously recommended in *People v. Lopez* (1977) 71 Cal.App.3d 568. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070-1071 (*Koontz*).) As relevant here, these include advisements that self-representation is almost always unwise and may be to the defendant's own detriment; that the defendant will receive no special indulgence by the court and is required to follow all the technical rules of substantive law, criminal

20

procedure and evidence in making motions and objections, presenting evidence and argument, and conducting voir dire; and that the prosecution will be represented by a trained professional who will give the defendant no quarter on account of his or her lack of skill and experience. (*Ibid.*) Furthermore, the trial court should inquire into the defendant's education and familiarity with legal procedures, probing the defendant's understanding of the alternative to self-representation, and exploring the nature of the proceedings, potential defenses and potential punishments. (*Id.* at p. 1071.) The trial court should warn the defendant that, in the event of misbehavior or disruption, his or her self-representation may be terminated. (*Ibid.*) Finally, the defendant should be advised that he or she will not be able to claim inadequacy of representation. (*Ibid.*)

"On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel. [Citation.]" (*Burgener*, *supra*, 46 Cal.4th at p. 241.) " 'Courts must indulge every reasonable inference against waiver of the right to counsel. [Citation.]' [Citation.]" (*Koontz*, *supra*, 27 Cal.4th at p. 1069.) Review is not limited to the transcript of the hearing for the *Faretta* motion. (*Id.* at p. 1070.) Our review includes proceedings that occurred after the purported invocation of the right of self-representation. (*People v. Marshall* (1997) 15 Cal.4th 1, 24.)

### C. The Faretta *Waiver Was Invalid*

Jimenez contends he did not knowingly and voluntarily waive his right to counsel, and he identifies numerous factors in the record to support his claim. First, he argues the trial court's oral advisements given at the hearing on September 11, 2019 were inadequate to warn him of the dangers and disadvantages in self-representation, among other deficiencies. As to the *Faretta* waiver form Jimenez provided, he contends he made numerous errors in his responses on the form that show he did not adequately read or understand it and that he was mistaken about critical aspects of the case, including his maximum exposure. Jimenez further contends the waiver was involuntary because he

21

believed he was forced to represent himself due to Holden Green's medical condition, his inability to obtain a public defender, and his financial inability to retain private counsel.

The Attorney General contends the trial court's oral advisements together with Jimenez's execution of the *Faretta* waiver form show he adequately understood his trial rights and the disadvantages of representing himself. As to voluntariness, the Attorney General disputes Jimenez's version of the procedural history. The Attorney General argues the record shows Jimenez voluntarily relieved Green and chose to represent himself despite Green's asserted unavailability for trial.

As a preliminary matter, we address whether Jimenez voluntarily chose to represent himself. We cannot rule out a reasonable probability that Jimenez involuntarily waived his to right to counsel. While the record holds some evidence that Holden Green engaged in delay tactics at various times in the course of his representation, we do not attribute those tactics to Jimenez personally. In the pretrial proceedings, Green filed multiple unmeritorious motions to continue the trial or disqualify the judge, but at the time of the *Faretta* waiver, Jimenez was no longer represented by Green. Moreover, the record suggests Jimenez did *not* wish to represent himself immediately after Green was relieved, as Jimenez first sought to obtain appointed counsel from the public defender's office. He did not move for self-representation until after the public defender's office found him financially ineligible for their services and Jimenez informed the court he was "unsuccessful" in obtaining private counsel. Jimenez's statements in subsequent proceedings further support a finding that he did not act voluntarily, as he sought to withdraw his *Faretta* waiver on the ground that he lacked the necessary expertise. Jimenez asserted that while he understood the facts of the case, "the legalese, the motions, the legal jargon, that's far [a]field from my level of knowledge at this point."

But even assuming Jimenez acted voluntarily in waiving his right to counsel, that does not by itself compel the further conclusion that Jimenez entered a valid waiver. That would be so even if Jimenez had been motivated primarily by a desire to engage in

22

delay tactics.  Trial courts generally have the discretion to deny a request for self-representation when the defendant merely seeks to delay the proceedings.  (*People v. Rudd* (1998) 63 Cal.App.4th 620, 626.)  But the trial court here *granted* the request, and the Attorney General contends the court did so properly.  The issue on appeal is not whether Jimenez had the right to move for self-representation, but whether he intelligently waived his right to counsel in doing so.

The Attorney General does not claim Jimenez deliberately entered an invalid waiver for purposes of delay, and the record would not support such a conclusion.  No additional delay would have resulted from the entry of a valid waiver; the additional time that would have been required for adequate advisements and inquiries was negligible.  Nor does the Attorney General contend the merits of the claim are incognizable on grounds of forfeiture, estoppel, or invited error.  Jimenez's motives are relevant only insofar as they might shed light on his understanding of the consequences and complexities of self-representation, and the Attorney General makes no such argument.  As explained below, Jimenez's subsequent attempts to withdraw his *Faretta* waiver and obtain counsel suggest he was *not* aware of the risks of self-representation regardless of his motives.

Our review of the record as a whole shows Jimenez did not knowingly and intelligently waive his right to counsel.  Multiple factors and circumstances support this conclusion.  First, the context preceding his *Faretta* motion suggests Jimenez was ill-prepared to understand the risks and consequences of self-representation in a jury trial.  The charges, evidence, and legal issues facing Jimenez were no more complex than those in a typical felony case if assessed by an experienced attorney.  But that degree of complexity, involving rules of evidence and the strictures of the jury trial process are well beyond the knowledge and level of skill of the average layperson.  That Jimenez was asserting the right to represent himself in a week-long jury trial as opposed to some less

23

complicated proceeding required the trial court to conduct a "more searching or formal inquiry." (*Patterson*, *supra*, 487 U.S. at pp. 299-300.)

Although Jimenez had appeared before Judge Zecher on several occasions prior to her ruling on his *Faretta* motion, she had limited personal interaction with him. Another judge accurately characterized Jimenez as "very articulate and logical," but he had no formal legal training, little or no relevant postsecondary education, and had never represented himself in any civil or criminal matter. His only criminal history consisted of a misdemeanor conviction for issuing a bad check. He stated he was a high school graduate, he had attended a mine safety academy, and his sole employment experience consisted of his work as a safety manager in the mining industry.[8]

Furthermore, Jimenez had no counsel for five weeks before the *Faretta* hearing. Green appeared with Jimenez at the hearing July 31, 2019 to inform the court Jimenez did not qualify for a public defender, but when Green offered to remain in the case until Jimenez found counsel, Judge Zecher informed Green he had already been relieved. Jimenez appeared at the next two hearings without counsel, and he still had no counsel when he entered his *Faretta* waiver on September 11. As a result, he had no attorney to review the waiver form with him or assist him in completing it. All this context weighs against the conclusion that Jimenez was acting with sufficient awareness of the dangers of self-representation at the time of the *Faretta* hearing.

Second, the transcript of the *Faretta* hearing and the content of the submitted waiver form show the court's advisements and inquiries were insufficient to ensure Jimenez entered a valid waiver. After Jimenez submitted the waiver form, Judge Zecher stated she was looking at the form and confirmed with Jimenez that the signatures and initials on it were his. She noted that Jimenez had "some formal education" and issued a single warning: "I am required to tell you that—as you have indicated in the form, it's

---

[8] The probation report states Jimenez had a high school GED from 2000 and some college at Middle Tennessee State in addition to his training at the mining academy.

24

not a good idea to represent yourself, given the level of experience that is present with the District Attorney's Office." She then advised Jimenez he also had the constitutional right to represent himself and she confirmed that he understood what she had told him. Viewed in isolation, the oral advisement failed to ensure Jimenez understood the risks and disadvantages of representing himself in a jury trial. The court made no inquiries into Jimenez's understanding of the case or the law, and she issued none of the other numerous "suggested advisements and inquiries" listed by the California Supreme Court in *Koontz*, *supra*, 27 Cal.4th at pages 1070 to 1071.

The Attorney General relies heavily on the *Faretta* waiver form Jimenez executed to argue he knowingly and intelligently waived the right to counsel. It is true that the preprinted text of the form thoroughly sets forth most of the advisements listed in *Koontz*, and Jimenez does not dispute that he signed and initialed it. But the Attorney General's position suffers from several defects.

First, the court never asked Jimenez if he had actually read and understood the form, and he had no counsel to review the form with him at the hearing. As detailed below, Jimenez made several errors in filling out the form and left some portions blank. And in at least one critical respect—the section requiring the defendant to state the maximum penalty for the charges—Jimenez supplied the wrong answer. Had the court reviewed the completed form with him, or if the court had confirmed that he reviewed it with counsel, his answers likely would have been different, as would the outcome of this claim.

A trial court's failure to question a defendant about his or her responses on a *Faretta* waiver form does not necessarily invalidate a waiver, particularly if there are no indications the defendant failed to understand what he or she was reading and signing. (*People v. Blair* (2005) 36 Cal.4th 686, 709, overruled on another ground in *People v. Black* (2014) 58 Cal.4th 912.) Here, however, the record holds such indications.

25

In a section requiring the defendant to state the charges, Jimenez wrote down incorrect penal code sections with no substantive description of the charges. In a section for defendant to respond to the prompt, "I am aware that there are certain legal defenses to the crime(s) with which I am charged, and they are as follows," Jimenez left the section blank. A section concerning penalties for a conviction listed several potential penalties and instructed the defendant to cross out all inapplicable penalties, but Jimenez did not cross out any of the inapplicable penalties, suggesting he had not carefully read the instruction or did not understand which penalties might be inapplicable.

As to the penalties that *were* applicable in this case, Jimenez incorrectly responded that the maximum sentence was three years in state prison. His actual exposure was five years four months in state prison. The trial court never mentioned this error at the *Faretta* hearing and never informed Jimenez of his actual maximum exposure. The failure to inform a defendant of the maximum penalty for a conviction may render a *Faretta* waiver invalid in some circumstances. "[T]he court should satisfy itself that the defendant understands the nature of the charges against him, though there is a split of authority in California as to whether the court must also specifically advise the defendant of the maximum penal consequences of conviction." (*People v. Ruffin* (2017) 12 Cal.App.5th 536, 544 (*Ruffin*).) Here the trial court here not only failed to advise Jimenez of his maximum exposure, it failed to correct him when he supplied the court with a waiver form erroneously stating his maximum exposure.

The Attorney General argues the record nonetheless supports an inference that Jimenez was aware of his maximum exposure. The Attorney General points out that the prosecutor stated the maximum sentence was five years four months at a subsequent hearing, but that hearing occurred more than three months after the *Faretta* hearing. The charging documents filed in 2016 and 2018 listed the range of penalties applicable to each charge, but few laypersons would know how to compute the maximum sentence from that information. Moreover, none of this explains why Jimenez listed an incorrect

26

maximum penalty on the waiver form, or why the trial court failed to inform him of the correct penalty.

We also find it significant that Jimenez left blank a section of the form instructing him to list legal defenses he was aware of, suggesting he did not read that section, had no awareness of what his defenses might be, or both. He made statements at the *Faretta* hearing further showing a lack of awareness in this regard. He asserted he wanted to represent himself in part because, "I just want the best defense possible." A more diligent judge would have responded to this by advising Jimenez he was unlikely to get the best defense by representing himself. Jimenez then stated, "[F]rom my vantage point the prosecution has failed to provide any type of compelling evidence that proves beyond a reasonable doubt the crimes that were committed." His stated vantage point evinced considerable ignorance about the strength of the prosecution's evidence, which included the prospect of consistent allegations of sexual conduct from a young witness, corroborated by her contemporaneous text messages and a recorded pretext call in which Jimenez repeatedly uttered inculpatory statements. While a trial court is not required to advise a defendant on the specific strengths of the prosecution's case, Jimenez's statements reflected a lack of awareness about the nature of the evidence he would have to litigate and the consequences of any failure to do so competently.

The record suggests Jimenez was insufficiently aware of another serious risk: that he would be unable to withdraw his *Faretta* waiver in subsequent proceedings. The Attorney General points out that Jimenez initialed a warning on the waiver form stating, "I understand that if I change my mind and decide I need an attorney, depending on the stage of the proceedings, my request for an attorney may be denied." That advisement is proper, but even if Jimenez read and understood it, the trial court made statements likely to undercut his appreciation for the risk that requests for counsel would be denied. Immediately after granting the *Faretta* motion, the court told Jimenez, "If at any time you decide to change your mind pretrial, please let me know. And then once trial comes

27

along we'll talk. It's a little different at that point in terms of a request to no longer proceed as a self-represented litigant." Judge Zecher later added, "Know that if you come in in three months and you say, now I want an attorney, that may not happen," but she subsequently denied his request for counsel two months and one week later on November 18, 2019.

Having made those statements, the court did not accurately inform Jimenez about the point at which requesting an attorney would become more difficult or what circumstances would make it less likely. The court's statements likely gave Jimenez the impression he would be allowed to withdraw his *Faretta* waiver at least until "trial comes along".[9] The subsequent proceedings support an inference Jimenez was ill-informed about those risks because he attempted and failed to withdraw his *Faretta* waiver multiple times. While we do not hold that the trial court was specifically required to advise Jimenez those attempts were likely to fail based the circumstances the court later cited in denying them, the trial court's statements risked giving Jimenez the opposite impression.

To support his claim, Jimenez relies on *Ruffin*, *supra*, 12 Cal.App.5th 536. Ruffin moved to represent himself at trial after the court granted defense counsel a continuance. In response, the court told Ruffin, " 'You are not that stupid. You have one of the best lawyers in the county.' " (*Id.* at p. 540.) The court urged Ruffin's father, who was present in court, to talk to Ruffin, adding, "He has a good lawyer. He doesn't know how

---

[9] Subsequent events compounded the ambiguity when a dispute arose about whether November 18, 2019—when Jimenez first requested counsel again—was effectively a "trial date" for purposes of timely requesting an attorney. After the trial court vacated that trial date, the prosecutor asserted she told Green she was arranging to have it maintained, but Jimenez was still representing himself at that point and the record does not clearly show whether he received notice of the change. On the other hand, these events were largely a consequence of Jimenez failing to appear for the status hearing in October. In any event, we do not rely on the precise timing of these events for our analysis.

to be a lawyer." (*Ibid.*) After a recess, Ruffin remained undeterred and provided the court with an initialed, signed *Faretta* waiver form. After confirming the initials and signature were Ruffin's, the court asked him if he had any questions, and Ruffin said he did not. The court then granted the *Faretta* motion without determining whether Ruffin had read and understood the form, and without asking Ruffin about ambiguities in his responses on the form regarding the charges against him. Nothing in the form or the oral exchange advised Ruffin of the penal consequences of a conviction. After he represented himself at trial, the jury found him guilty.

Based on these circumstances, the Court of Appeal held the waiver was invalid because the trial court had failed to adequately advise Ruffin of the dangers and disadvantages of self-representation. (*Ruffin*, *supra*, 12 Cal.App.5th at p. 539.) The Court of Appeal found the trial court's oral statement to Ruffin that, "You are not that stupid," along with the statements to Ruffin's father, had advised Ruffin "in substance, that it was unwise for him to represent himself." (*Id.* at p. 546.) But the Court of Appeal held this lone oral warning was insufficient without any further advisements, and the Court rejected the Attorney General's argument that Ruffin's execution of the waiver form showed his waiver was knowing and voluntary. (*Ibid.*) "[E]ven when a waiver form is completed, the court's duty remains to ensure that the defendant's waiver of the right to counsel is knowing and voluntary." (*Id.* at pp. 548-549.) The Court of Appeal held the record showed the waiver was invalid notwithstanding the executed waiver form because the trial court failed to ascertain that Ruffin had actually read and understood it, and the trial court failed to inquire about the ambiguities in his responses regarding the nature of the charges against him.

*Ruffin* is on point and we find its reasoning persuasive. Like the trial court in *Ruffin*, the court here issued a brief oral advisement informing Jimenez it was "not a good idea" to represent himself given the prosecution's expertise, but the court issued no other verbal warnings and failed to make additional inquiries sufficient to ensure a valid

29

waiver. And like the trial court in *Ruffin*, the court here confirmed Jimenez had signed and initialed the form, but the court failed to determine whether he actually read and understood it. Furthermore, as in *Ruffin*, the court here failed to inquire about deficiencies in Jimenez's responses to the written waiver form, including an erroneous response about the maximum penalty for a conviction. Finally, as in *Ruffin*, the trial court here failed to advise Jimenez of the correct maximum penalty.

We acknowledge the trial court was placed in a difficult position, largely as a consequence of Holden Green's failure to represent Jimenez in a professional manner. But the court had other options in response to Jimenez's unsuccessful attempts to retain new counsel prior to his moving for self-representation. Given Jimenez's expressed desire to be represented by counsel, the trial court could have ordered the public defender to represent him or appointed counsel. (See, e.g., § 987.2.)

For the reasons above, we conclude Jimenez did not enter a knowing and intelligent *Faretta* waiver and suffered a deprivation of the right to counsel at trial as a consequence. The Attorney General argues any error in the waiver was harmless, but the California Supreme Court has held this to be "structural error" requiring automatic reversal. (*People v. Waldon* (2023) 14 Cal.5th 288, 310.) Accordingly, we will reverse the judgment.

Jimenez raises four additional claims: First, he contends the trial court erred by denying his motions to withdraw the *Faretta* waiver and allow counsel to resume representation. Second, he contends the trial court erred by relieving attorney Holden Green as counsel. Third, he contends the trial court erred by failing to appoint counsel and or determine Jimenez's financial eligibility for indigent representation. Fourth, he contends cumulative prejudice from multiple errors requires reversal. Because we conclude that the deprivation of counsel from the invalid *Faretta* waiver requires automatic reversal, we do not reach these claims.

### III. DISPOSITION

The judgment is reversed.

_____
Greenwood, P. J.

WE CONCUR:


_____
Grover, J.


_____
Danner, J.


People v. Jimenez
H048103